# IN THE SUPREME COURT OF IOWA

No. 16–1720

Filed June 22, 2018

**STATE OF IOWA,**

Appellee,

vs.

**TERRY LEE COFFMAN,**

Appellant.

---

Appeal from the Iowa District Court for Story County, James B. Malloy, Judge.

The defendant seeks further review of a court of appeals decision affirming his conviction for operating while intoxicated, contending that the district court erred in denying his motion to suppress. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Matthew T. Lindholm of Gourley, Rehkemper, & Lindholm, P.L.C., West Des Moines, for appellant.

Thomas J. Miller, Attorney General, Kevin Cmelik and Zachary Miller, Assistant Attorneys General, Jessica Reynolds, County Attorney, and Shean Fletchall, Assistant County Attorney, for appellee.

**MANSFIELD, Justice.**

This case requires us to decide whether an officer was justified in pulling behind a vehicle and activating his emergency lights when the vehicle was stopped by the side of a highway after 1:00 a.m. with its brake lights engaged. We conclude the officer's actions were justified under the "community caretaking function" exception to the warrant requirement of the Fourth Amendment and article I, section 8 of the Iowa Constitution. For this reason, we affirm the conviction for operating while intoxicated that resulted from this roadside encounter.

## I. Background Facts and Proceedings.

In the early hours of May 22, 2016, Story County Sheriff's Deputy Nicholas Hochberger was on assigned patrol in the southern part of the county. When he was outside Slater at approximately 1:08 a.m., he spotted a vehicle pulled over on the side of the highway with its brake lights on. Deputy Hochberger turned on his flashing red and blue lights, and he pulled to a stop behind the parked vehicle. Deputy Hochberger later testified his objective in making this kind of stop is to "check on the welfare of the occupants or see if they need any assistance, if they have vehicle problems or medical problems, or if they're just talking on their phone." Deputy Hochberger also explained why he activated his flashers:

> First reason is it alerts traffic approaching any other direction that I am stopped on the side of the roadway and that there is potentially a hazard there; and number two is to alert the driver or subjects of the vehicle that it's just not a stranger pulling up behind them. It is a law enforcement officer stopping to check on them.

Deputy Hochberger did not run the vehicle's license plate through dispatch before exiting his vehicle. Instead, he immediately approached the driver's side window on foot to speak with the driver. While passing the rear of the vehicle, the deputy noticed a registration violation because

the license plate bracket covered the sticker and it was not possible to tell whether the registration was current.

Upon reaching the driver's window, Deputy Hochberger immediately detected a strong odor of alcoholic beverage and noticed the driver's red and watery eyes. Deputy Hochberger's initial questions were directed at determining if there was an emergency or if the occupants needed assistance. He asked, "Hi guys, everything okay tonight?"

When the driver, Terry Coffman, and his wife indicated that they were okay, Deputy Hochberger then asked, "[W]hat's going on?" Coffman answered that his wife was having neck issues, so he had pulled over to give her a back rub. At that point, Deputy Hochberger requested Coffman's license and registration and asked Coffman how much he had had to drink that night. Coffman replied that he had consumed four beers, the most recent a half hour before the stop.

Deputy Hochberger administered field sobriety tests, which Coffman failed. Coffman was belligerent while performing the tests. After also administering a preliminary breath test, the deputy determined that Coffman was under the influence of alcohol and placed Coffman under arrest. At the jail, implied consent was invoked, and Coffman refused to submit to the chemical test.

On June 16, Coffman was charged by trial information in the Iowa District Court for Story County with operating while intoxicated (OWI), first offense, in violation of Iowa Code section 321J.2, a serious misdemeanor. See Iowa Code § 321J.2(2)(a) (2016).

On August 25, Coffman filed a motion to suppress the evidence obtained as a result of the stop of his vehicle. He alleged the stop violated his rights under both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. An

evidentiary hearing on Coffman's motion took place on September 9, and the court issued a written ruling denying the motion on September 12.

Coffman filed a motion to reconsider, to reopen the record, and for expanded findings and conclusions. This motion asked the court for the first time "to distinguish the Fourth Amendment protections from those under the Iowa Constitution." In particular, Coffman asked the court either to limit the community caretaking doctrine "to those cases where emergency aid or assistance is needed or alternatively apply[] the exclusionary rule to those cases where evidence of criminal activity is gathered as a result of a community caretaking seizure." The court issued expanded findings and conclusions but confirmed its denial of the motion to suppress.

In its order, the court noted,

> A car parked on the shoulder of a highway at 1:00 a.m. in a rural area in Iowa should raise a number of concerns. There is a safety issue in having a vehicle parked within two feet of the traveled portion of a highway, especially at 1:00 a.m., in an area that is not lighted. Second, the occupant(s) of the vehicle might have car problems or medical issues that they are experiencing. Most people would not simply pull over to the side of the road in this type of setting at such an hour. It would have been irresponsible for Deputy Hochberger to simply drive by without checking on the vehicle.

Coffman waived his right to a jury trial and stipulated to a trial on the minutes of testimony. On October 12, the court found Coffman guilty of OWI, first offense, in violation of Iowa Code section 321J.2. The district court sentenced Coffman to two days in jail and ordered him to pay a fine and surcharges.

Coffman appealed, claiming that the stop of his vehicle and person violated the Fourth Amendment of the U.S. Constitution and article I, section 8 of the Iowa Constitution. We transferred the case to the court of

appeals, which affirmed Coffman's conviction, concluding that the stop demonstrated a "good-faith effort by a peace officer to assist the motorist as a public servant rather than to launch a criminal investigation."

We granted Coffman's application for further review.

## II. Standard of Review.

Coffman argues that the seizure violated his rights under both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. "When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo." *State v. Storm*, 898 N.W.2d 140, 144 (Iowa 2017) (quoting *State v. Brown*, 890 N.W.2d 315, 321 (Iowa 2017)). We examine the whole record and "make 'an independent evaluation of the totality of the circumstances.' " *Id.* (quoting *Brown*, 890 N.W.2d at 321). "Each case must be evaluated in light of its unique circumstances." *State v. Kurth*, 813 N.W.2d 270, 272 (Iowa 2012) (quoting *State v. Krogmann*, 804 N.W.2d 518, 523 (Iowa 2011)).

## III. Analysis.

Coffman claims that he was lawfully parked on the shoulder of the highway and that Deputy Hochberger's actions violated the Fourth Amendment and article I, section 8. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons . . . against unreasonable seizures and searches, shall not be violated, and no Warrants shall issue, but on probable cause . . . ."); Iowa Const. art. I, § 8 ("The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated; and no warrant shall issue but upon probable cause . . . ."). The State counters that the seizure of Coffman's vehicle was justified by the community caretaking exception to the warrant requirement under both the Fourth Amendment and article I, section 8.

**A. The Community Caretaking Exception.** The community caretaking exception to the warrant requirement, recognized by the United States Supreme Court in *Cady v. Dombrowski*, is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973). This exception "involves the duty of police officers to help citizens an officer reasonably believes may be in need of assistance." *State v. Tyler*, 867 N.W.2d 136, 170 (Iowa 2015) (quoting *State v. Kern*, 831 N.W.2d 149, 172–73 (Iowa 2013)). We have addressed this exception on a number of occasions under both the United States and Iowa Constitutions. *See, e.g., id.* at 167, & n.15, 170–71 (Fourth Amendment); *Kern*, 831 N.W.2d at 172–74 (article I, section 8); *Kurth*, 813 N.W.2d at 274–81 (Fourth Amendment); *State v. Wilkes*, 756 N.W.2d 838, 842 (Iowa 2008) (Fourth Amendment); *State v. Tague*, 676 N.W.2d 197, 204–06 (Iowa 2004) (article I, section 8); *State v. Crawford*, 659 N.W.2d 537, 541–44 (Iowa 2003) (Fourth Amendment); *State v. Moore*, 609 N.W.2d 502, 503–04 (Iowa 2000) (en banc) (Fourth Amendment); *State v. Carlson*, 548 N.W.2d 138, 140–41, 143 (Iowa 1996) (Fourth Amendment and article I, section 8).

The community caretaking exception has three branches: "(1) the emergency aid doctrine, (2) the automobile impoundment/inventory doctrine, and (3) the 'public servant' exception." *Tyler*, 867 N.W.2d at 170 (quoting *Kurth*, 813 N.W.2d at 274). The emergency-aid and public-servant doctrines are closely related. *See Kurth*, 813 N.W.2d at 274 (quoting *Crawford*, 659 N.W.2d at 541).

> Under the emergency aid doctrine, the officer has an immediate, reasonable belief that a serious, dangerous event is occurring. . . . [I]n contrast, the officer in a public servant situation might or might not believe that there is a difficulty requiring his general assistance. For example, an officer assists a motorist with a flat tire under the public servant

doctrine, but an officer providing first aid to a person slumped over the steering wheel with a bleeding gash on his head acts pursuant to the emergency aid doctrine.

*Tyler*, 867 N.W.2d at 170 (alterations in original) (quoting *Crawford*, 659 N.W.2d at 541–42). Other than that slight distinction, the two doctrines are analytically similar. *See id.*; *see also Kern*, 831 N.W.2d at 173 (describing them as "very similar").

We have said that application of the community caretaking exception involves a three-step analysis:

> (1) was there a seizure within the meaning of the Fourth Amendment?; (2) if so, was the police conduct bona fide community caretaker activity?; and (3) if so, did the public need and interest outweigh the intrusion upon the privacy of the citizen?

*Crawford*, 659 N.W.2d at 543; *accord Tyler*, 867 N.W.2d at 170; *Kern*, 831 N.W.2d at 173; *Kurth*, 813 N.W.2d at 277. We have cautioned that "[e]very community caretaking case must be assessed according to its own unique set of facts and circumstances." *Kurth*, 813 N.W.2d at 277.

**B. Community Caretaking Under the Fourth Amendment.** Coffman first challenges Deputy Hochberger's stop under the Fourth Amendment. We have not previously considered whether a law enforcement officer is justified in parking behind and activating his emergency lights to check on a motorist pulled over on the side of the highway in the middle of the night. In *Moore,* we held that a park ranger properly exercised a public-safety function when she stopped the defendant's vehicle to warn him that his speed posed a danger to park campers, even though he was driving under the speed limit. 609 N.W.2d at 503–04. In *Kurth,* we held that a police officer was not justified in blocking in the defendant's vehicle with his own where the defendant had turned into a restaurant parking lot and parked that vehicle after

apparently running over a road sign that had fallen into the street. *See* 813 N.W.2d at 278–81. That seizure occurred after the officer had already ascertained that the damage to the vehicle was "not significant" and the defendant "was in a position to address that damage." *Id.* at 280.

Other state courts, however, have addressed situations close to the present case. As we pointed out in *Kurth*, it is "not surprising" that much of the relevant caselaw has arisen in state courts "in light of the fact that community caretaking is generally the role of local police rather than federal officers." *Id.* at 273–74. The majority of other state courts have sustained seizures similar to the one that occurred in the present case.

The Illinois Supreme Court upheld a stop under the community caretaking doctrine in *People v. McDonough*, 940 N.E.2d 1100, 1110 (Ill. 2010). A trooper was on patrol at 7:30 p.m. when he noticed a car stopped on the shoulder of a busy highway with the headlights off. *Id.* at 1103. The trooper "decided to inquire whether the car's occupants needed assistance." *Id.* The trooper turned on his overhead oscillating emergency lights for safety purposes and pulled in behind the stopped vehicle. *Id.* at 1103–04. The trooper's initial question upon approaching the vehicle was whether everything was okay. *Id.* at 1104. The driver rolled down the window further to answer, and the trooper smelled the odor of an alcoholic beverage. *Id.* After failing field sobriety tests, the driver was arrested. *Id.*

The Illinois court determined that the seizure was permissible under the community caretaking exception to the warrant requirement of the Fourth Amendment. *Id.* at 1109. In coming to this conclusion, the court said,

> [I]t was reasonable for [the trooper] to approach defendant's vehicle to offer any aid required under the circumstances. The public has a substantial interest in ensuring that police offer assistance to motorists who may be stranded on the side of a

highway, especially after dark and in areas where assistance may not be close at hand. In the proper performance of his or her duties, a law enforcement officer has the right to make a reasonable investigation of vehicles parked along roadways to offer such assistance as might be needed and to inquire into the physical condition of persons in vehicles. The occupant of a parked vehicle may be intoxicated, suffering from sudden illness, or may be only asleep. Under these circumstances, it is within a responsible law enforcement officer's authority to determine whether assistance is needed.

*Id.* at 1109–10 (citation omitted).

In *State v. Anderson,* the Utah Supreme Court likewise held that the seizure of a motorist who had stopped his vehicle on the side of the road was justified by the community caretaking doctrine under the Fourth Amendment. 362 P.3d 1232, 1234 (Utah 2015). Late one evening in December, the defendant had pulled his car to the side of the road and turned his hazards on. *Id.* "Because of the hazard lights, the cold weather, and the late hour, the deputies decided to stop and check on the welfare of any occupants of the vehicle." *Id.* The deputies engaged their red and blue flashing lights and pulled up behind the stopped vehicle. *Id.* After they asked him whether he needed assistance, the deputies noticed that he had bloodshot eyes. *Id.* They ultimately "obtained a warrant authorizing them to arrest [the defendant], obtain blood or urine from him, and search his vehicle," within which they found marijuana. *Id.* at 1235. The court concluded that the stop was minimally invasive into the defendant's rights and that "a reasonable officer would have cause to be concerned about the welfare of a motorist in [the defendant's] situation." *Id.* at 1239–40. The court further noted,

> A motorist may have many motivations for pulling to the side of a highway and engaging hazard lights, ranging from the mundane to the life-threatening. The motorist could be lost, disciplining rowdy children, sleeping, or answering a cell phone call. But there is also a good chance that the motorist has run out of gas, has mechanical problems, or, worse, is experiencing a medical emergency. The fact that it is very cold

and dark would exacerbate the duress of a motorist in need of aid. Given the decent odds that a motorist in this situation may need help, an officer would have reason to be concerned and to at least stop to determine whether assistance is needed.

*Id.* at 1240.

In *Ullom v. Miller*, the West Virginia Supreme Court of Appeals likewise found a seizure of a motorist was justified under the community caretaking exception under both the Fourth Amendment and the West Virginia Constitution. 705 S.E.2d 111, 123 (W. Va. 2010). The defendant there had parked on the side of the road and turned on the parking lights. *Id.* at 116. The vehicle's hazard lights were not on, and the engine was not running. *Id.* When the officer came across the vehicle at dusk during his patrol, he had no other indication the driver needed assistance. *Id.* The officer nevertheless "initiated a road safety check of the vehicle by stopping his cruiser and approaching the vehicle." *Id.* When he conversed with the driver, he noted signs of intoxication. *Id.* Upon failing sobriety tests, the driver was arrested for driving under the influence. *Id.*

The West Virginia court held that given the circumstances of the case, "a reasonable and prudent officer in such a setting would have reasonably suspected that an occupant of the vehicle was in need of immediate help." *Id.* at 123. Furthermore, the officer's "initiating reasons for his encounter with [the defendant] were, when viewed objectively, quite clearly a reasonable, independent and substantial justification for any intrusion he made into [the defendant's] privacy." *Id.*

In *State v. Kramer*, the Wisconsin Supreme Court also affirmed the seizure of a motorist over federal and state constitutional objections. 759 N.W.2d 598, 601 (Wis. 2009). In that case, the defendant's vehicle was legally parked on the shoulder of a highway after the sun had set. *Id.* The driver had turned the hazards on while he made a phone call. *Id.* A

sheriff's deputy spotted him, activated his cruiser's emergency overhead lights, and stopped behind the parked car. *Id.* The deputy's reason for stopping was "to check to see if there actually was a driver, [and to] offer any assistance." *Id.* (alteration in original). The deputy activated his own emergency lights for "[s]afety considerations so other traffic could see [him]." *Id.* (first alteration in original). Although he approached the vehicle shining his flashlight and with his hand on his holstered gun—a practice the deputy regularly followed "for safety considerations"—he asked the driver if he could help with something and said he was "[j]ust making sure [there were] no vehicle problems." *Id.* at 601–02. During the interaction, the deputy could tell that the driver was intoxicated, and the driver was then arrested. *Id.* at 602.

The Wisconsin court held that the seizure was justified. *Id.* at 612. It concluded the deputy had "an objectively reasonable basis for deciding that a motorist may have been in need of assistance when he stopped behind [the defendant's] vehicle." *Id.* at 610. The court also noted "that the public has a substantial interest in ensuring that police assist motorists who may be stranded on the side of a highway, especially after dark and outside of an urban area when help is not close at hand." *Id.* at 611.

In *State v. Lovegren*, the Montana Supreme Court similarly upheld a seizure of a motorist based on the community caretaking doctrine. 51 P.3d 471, 476 (Mont. 2002). There, an officer noticed a vehicle parked on the side of the highway at 3:05 a.m. *Id.* at 471–72. Upon approaching the vehicle, the officer found the defendant asleep in the driver's seat and knocked on the window. *Id.* at 472. When the defendant did not wake up, the officer opened the door. *Id.* The defendant suddenly awoke and blurted, "I was drinking." *Id.* The officer spotted other signs of

intoxication, and after the defendant failed the field sobriety tests, he was charged with driving under the influence. *Id.*

Overruling both federal and state constitutional objections, the Montana court found the officer had acted properly because the officer had "objective, specific and articulable facts suggesting that [the defendant] might be in need of assistance." *Id.* at 476. According to the court,

> While [the defendant] might simply have been asleep, he might just as likely have been ill and unconscious and in need of help. Under these circumstances, Officer Hofer had the right to check on [the defendant's] welfare and to open the door of [the defendant's] vehicle when [the defendant] failed to respond to a knock on the window of his vehicle. As the State points out, it would have been a dereliction of Officer Hofer's duties if, after knocking on the window and obtaining no response, Officer Hofer walked away and continued on his patrol.

*Id.*

The Tennessee Supreme Court confronted a similar situation in *State v. McCormick* and found the seizure was justified by the community caretaking doctrine under the United States and Tennessee Constitutions. 494 S.W.3d 673, 689 (Tenn. 2016). At 2:45 a.m., a law enforcement officer pulled behind a vehicle that was sitting in the entrance to a shopping center parking lot. *Id.* at 676. The shopping center was closed, and the back left wheel and rear portion of the vehicle were "partially in the roadway." *Id.* The officer parked behind the vehicle and turned on his blue lights for safety reasons. *Id.* He proceeded "to do a welfare check on the subject in the vehicle." *Id.* The driver was slumped over the steering wheel, the engine was running, and the headlights were on. *Id.* When the officer was unable to awaken the driver by tapping on the window, he opened the car door. *Id.* The officer immediately detected signs that the

driver had been drinking. *Id.* The driver failed field sobriety tests and was arrested for driving under the influence. *Id.* at 676–77.

The Tennessee court determined that the officer's conduct fell within the community caretaking exception. *Id.* at 688–89. The court explained,

> Given the time, 2:45 a.m., location, and limited accessibility and availability of assistance from sources other than the officer, the risk of danger had the officer provided no assistance was substantial. Indeed, Sgt. Trivette would have been "derelict in his duty as a police officer" had he failed to take steps to determine the defendant's welfare. Again, the defendant was slumped over the steering wheel, either asleep or unconscious, with his vehicle protruding partially onto the public roadway, placing him at risk of injury or death from a rear end collision. Having carefully considered the relevant facts, we conclude that Sgt. Trivette's actions were well within the community caretaking exception.

*Id.* at 688–89 (quoting *Commonwealth v. Fisher,* 13 N.E.3d 629, 633 (Mass. App. Ct. 2014)).

In *State v. Kleven,* the South Dakota Supreme Court likewise found that an officer properly exercised his community caretaker function, and therefore concluded the officer's seizure of a motorist was permissible under the Fourth Amendment. 887 N.W.2d 740, 743–44 (S.D. 2016). The officer saw a vehicle parked on the side of the street in the early hours of the morning in a downtown area. *Id.* at 741. He requested a license plate check. *Id.* After waiting some twenty minutes, he decided to park his patrol car directly behind the defendant's vehicle and arranged for another patrol car to park directly in front. *Id.* The officer believed the driver was passed out or asleep. *Id.* The officer then knocked on the car window; the defendant stirred but did not acknowledge the officer. *Id.* The officer opened the door and detected the odor of an alcoholic beverage. *Id.* The driver was arrested and charged with driving under the influence. *Id.* The

court determined that, given the circumstances, the officer had sufficient reason to conduct a health and safety check. *Id.* at 743.

The North Dakota Supreme Court upheld the seizure of a motorist in *Borowicz v. North Dakota Department of Transportation* after an officer noticed a vehicle parked on a service road with its headlights on but the motor off. 529 N.W.2d 186, 187 (N.D. 1995). When the officer saw someone slumped in the driver's seat, he pulled behind the vehicle and activated his overhead lights. *Id.* at 187–88. He approached the driver's side, knocked on the window, and observed that the driver appeared to be asleep. *Id.* He knocked harder with his flashlight, awakening the driver, who then opened the door to the pickup. *Id.* In the subsequent interaction, the officer noticed signs of intoxication, and the defendant was eventually arrested. *Id.* at 187. The court concluded the officer's conduct was reasonable under the circumstances. *Id.* at 188–89.

In *People v. Laake*, the Illinois Appellate Court upheld a vehicle seizure under the community caretaking doctrine of the Fourth Amendment. 809 N.E.2d 769, 772–73 (Ill. App. Ct. 2004).[1] There, the officer received a report at approximately 3:00 a.m. from police dispatch about a possible intoxicated driver in his area of patrol. *Id.* at 770–71. While searching for that car, he happened upon a vehicle stopped on the shoulder with its brake lights on. *Id.* at 771. He pulled behind the vehicle and activated his overhead emergency lights. *Id.* His purpose was "to check on the welfare of [the] driver." *Id.* Additionally, "[t]he area was isolated and not well lighted." *Id.* During the officer's initial encounter with the driver, he noticed telltale signs of intoxication and that the driver

---

[1]We distinguished the *Laake* decision in *Kurth*. *See Kurth*, 813 N.W.2d at 280–81.

had a flat tire. *Id.* The driver was ultimately convicted of driving under the influence. *Id.*

The appellate court concluded that there was "nothing wrong" with the officer's "check[ing] on the welfare of [the car's] driver." *Id.* at 773. "Police officers routinely provide roadside assistance in addition to conducting criminal investigation. Such assistance is designed to ensure public safety, and we do not believe that any concomitant technical detention is unreasonable." *Id.*

In *Marsh v. State,* an Alaska appellate court found that a seizure was permitted under the community caretaking exception to the Fourth Amendment warrant requirement. 838 P.2d 819, 820 (Alaska Ct. App. 1992). During the early evening hours, a state trooper noticed a vehicle that appeared to be stalled on the side of a highway. *Id.* The trooper activated his overhead lights and pulled behind the car; activation of the lights was "standard police procedure so that traffic on the highway could see [the trooper] parked along the road in the dark." *Id.* At this point, the driver started the engine of his vehicle. *Id.* Nonetheless, the officer proceeded to speak to the driver and thus learned his license had been revoked. *Id.* Assuming for purposes of appeal that there had been a seizure, the appellate court determined that the trooper acted properly pursuant to his community caretaking function in finding out whether the driver needed assistance. *Id.*

In *Kozak v. Commissioner of Public Safety*, a Minnesota appellate court decided that a deputy's conduct was justified under the community caretaking exception. 359 N.W.2d 625, 628 (Minn. Ct. App. 1984). The defendant had parked on the side of the road and fallen asleep. *Id.* at 627. A deputy stopped to investigate and knocked on the window to awaken the driver. *Id.* The driver opened the door, and the deputy noted signs of

intoxication. *Id.* The driver failed the field sobriety tests and was arrested. *Id.* The court noted,

> In the proper performance of his duties, an officer has not only the right but a duty to make a reasonable investigation of vehicles parked along roadways to offer such assistance as might be needed and to inquire into the physical condition of persons in vehicles.

*Id.* at 628. The court added,

> The occupant of an already parked car may be intoxicated, he may be suffering from sudden illness or heart attack, or may be just asleep. Surely, it is within a responsible peace officer's duty as it relates to the public to determine whether his assistance is needed.

*Id.*

Coffman directs us to *Commonwealth v. Livingstone,* a recent case where the Pennsylvania Supreme Court found a Fourth Amendment violation. 174 A.3d 609, 638 (Pa. 2017). In *Livingstone,* a trooper saw a vehicle pulled over onto the right shoulder of a divided highway with the engine running but the hazard lights not activated. *Id.* at 614. The trooper "activated his emergency lights and, with his passenger window down, pulled alongside the stopped vehicle." *Id.* After motioning to the driver to roll down the window, he asked her if she was okay. *Id.* The driver appeared to be staring at him with "glossy eyes" but answered affirmatively. *Id.* Nevertheless, the trooper pulled his cruiser in front of the stopped vehicle, exited his vehicle, and approached the driver on foot. *Id.* When the trooper reached the vehicle, he asked to see the motorist's driver's license and asked whether she had been drinking. *Id.* The motorist denied drinking but made a number of confused statements. *Id.* Based on these statements and the appearance of the motorist's eyes, a preliminary breath test was administered, and ultimately the motorist was convicted of driving under the influence. *Id.* at 614–15.

The Pennsylvania court found that a seizure had occurred as soon as the trooper pulled alongside the stopped vehicle with his flashers on. *Id.* at 621–25. Turning to the question whether the community caretaking exception applied, the court held that "the officer must point to specific, objective, and articulable facts which would reasonably suggest to an experienced officer that assistance *was needed.*" *Id.* at 637 (emphasis added). Notwithstanding an extensive review of cases like *Ullom, Kramer, Lovegren, McCormick, McDonough,* and *Kleven* where similar seizures had been upheld, the court overturned the motorist's conviction. *Id.* at 629–33, 638. In its view, the trooper was not able to "articulate any specific and objective facts that would reasonably suggest that Appellant needed assistance." *Id.* at 638 (plurality opinion).

Federal courts have also weighed in on this subject. *See, e.g., United States v. Barry,* 394 F.3d 1070, 1075 (8th Cir. 2005) (holding that it was not a seizure when the officer approached the parked vehicle and knocked on the window). For instance, in *Winters v. Adams,* the United States Court of Appeals for the Eighth Circuit found that a seizure of a driver in a parked vehicle was justified by the community caretaking doctrine. 254 F.3d 758, 764 (8th Cir. 2001).[2] There, the officers were responding to a complaint regarding an unknown, intoxicated individual. *Id.* at 760, 761. The first officer to arrive came upon a person seated behind the wheel of a car in the suspected area. *Id.* The officers approached to ask him about his circumstances, and he responded that he was "waiting for a push to start his car." *Id.* When the officer asked for identification, the driver rolled up the window, locked the door, and said he wanted to be left alone. *Id.* Neither officer suspected criminal activity, but the driver began acting

---

[2]We also distinguished *Winters* in our *Kurth* decision. *See* 813 N.W.2d at 275–76.

strangely and moving about wildly in his car. *Id.* at 760–61. The officers "were initially concerned with determining [the driver's] physical condition in order to ensure that 'he would not be able to drive and hurt someone.' " *Id.* at 761. Another officer testified that "he felt that he had a responsibility to protect [the driver] and 'the public at large to make sure this person can't hurt anyone else.' " *Id.* The officers thus broke into the car and forcibly removed the driver, whose ultimate diagnosis was "methamphetamine intoxication." *Id.* at 761–62.

In determining that the stop was justified, the court found that the officers " 'would have been derelict in their duties' had they not detained" the driver. *Id.* at 764. (quoting *United States v. Rideau*, 949 F.2d 718, 720 (5th Cir. 1991), *rev'd on other grounds on reh'g*, 969 F.2d 1572, 1573 (5th Cir. 1992) (en banc)). To find otherwise would have required the officers "simply to walk away from [the] vehicle, thus perhaps permitting a possibly intoxicated individual to drive the vehicle, potentially harming himself and other citizens." *Id.* (footnote omitted).

In *United States v. Ingram*, the United States Court of Appeals for the Ninth Circuit determined that the seizure of the defendant's parked vehicle was not justified by the community caretaking doctrine. 151 F. App'x 597, 599 (9th Cir. 2005). A U.S. Park Police Officer noticed a vehicle parked at an "awkward angle" and decided to investigate along with another officer. *Id.* at 598. The court rejected the government's community caretaking argument because

> [o]nce the officers were able to observe that the passengers were in no distress of any kind, no "reasonable grounds [existed] to believe that there [was] an emergency at hand and an immediate need for their assistance for the protection of life or property."

*Id.* at 599 (second and third alterations in original) (quoting *United States v. Cervantes*, 219 F.3d 882, 888 (9th Cir. 2000), *overruled on other grounds by Brigham City v. Stuart*, 547 U.S. 398, 404, 126 S. Ct. 1943, 1948 (2006)).

As previously noted, we examine every community caretaking case before us according to its own set of unique circumstances. *Kurth*, 813 N.W.2d at 277. We must decide "whether the facts available to the officer at the time of the stop would lead a reasonable person to believe that the action taken by the officer was appropriate." *Tague*, 676 N.W.2d at 204. To demonstrate reasonableness, the State must show "specific and articulable facts that indicate [the officer's] actions were proper." *Kurth*, 813 N.W.2d at 277 (quoting *Crawford*, 659 N.W.2d at 542).

The present case is unlike our *Kurth* case or the Ninth Circuit's *Ingram* case, where objective facts available to the officers indicated that the community caretaking need had *dissipated* by the time the seizures occurred. *See Ingram*, 151 F. App'x at 599; *Kurth*, 813 N.W.2d at 280–81. In *Kurth*, a motorist appeared to have run over a sign that had fallen into the roadway. 813 N.W.2d at 271. By itself, this could have justified an officer's community caretaking intervention. *Id.* at 278. However, the motorist thereafter promptly and lawfully pulled into the parking lot of an open restaurant and parked his vehicle. *Id.* at 271–72. The officer saw that there was no difficulty with the drivability of the vehicle and the damage to the vehicle was insignificant. *Id.* at 272, 278. Nevertheless, at that point the officer activated his emergency lights and blocked in the vehicle. *Id.* at 278. In short, in *Kurth*, the putative community caretaking seizure occurred only after the *need* for such a seizure had ended. *Id.* The motorist was parked in a parking lot of an open restaurant and appeared to be in a position to address any minor vehicle damages. *Id.*

Other cases cited by Coffman are distinguishable for the same reasons. *See State v. Graham,* 175 P.3d 885, 891 (Mont. 2007) (finding under federal and state constitutional principles that the seizure of a parked vehicle on a dirt pullout was not reasonable where the officer had seen the truck driving shortly before the stop and thus knew that it was operable); *State v. Button,* 86 A.3d 1001, 1005 (Vt. 2013) (holding that the stop was not justified under the Fourth Amendment or state constitution in part because "[t]he trooper saw that all of the various lights on defendant's car were operating properly, and that defendant's car was running fine").

This case also can be distinguished from cases cited by Coffman where the vehicle was parked well off the road, and therefore, the officer could have safely stopped and sought to speak with the driver without activating his flashers. *See State v. Schmidt,* 47 P.3d 1271, 1272, 1274 (Idaho Ct. App. 2002) (finding that the seizure of the vehicle by activating the overhead lights and blocking it in was not justified under the Fourth Amendment where the vehicle was "parked twenty to thirty feet off on the right side of the road in an unimproved pullout"); *State v. Boutin,* 13 A.3d 334, 337–38 (N.H. 2010) (finding under the state constitution that the trooper's actions were unreasonable when the vehicle was parked in a "pull-off area" and the trooper could have pulled alongside the driver to do a welfare check without performing a seizure by activating his flashers).

The present case is also unlike our own *State v. Coleman,* where after the vehicle had been seized, objective facts became available to the officer demonstrating the problem that was the basis for the stop had been resolved. *See* 890 N.W.2d 284, 285, 301 (Iowa 2017) (holding that after stopping a motorist on suspicion of driving while suspended, but then determining that the driver was not the motorist in question, the officer

had to let the motorist go immediately without asking for license, registration, and proof of insurance). This case is actually the reverse of a *Coleman* situation. After making the initial stop, Deputy Hochberger determined that there was a violation with respect to vehicle registration, thus providing further justification for the stop.

Lastly, *Livingstone*, the Pennsylvania case on which Coffman relies, is factually and legally distinguishable. In *Livingstone*, the trooper came upon the motorist at 9:30 p.m. and acknowledged that when he pulls alongside a vehicle, "[n]ine out of ten times usually they're on their cell phone." 174 A.3d at 638. In the present case, though, Deputy Hochberger came upon a vehicle pulled just off a rural road after 1:00 a.m. The odds that a law enforcement officer was just interrupting a routine cell phone call diminish, undoubtedly, as the hour gets later.

Furthermore, *Livingstone*'s invariable requirement that the officer have "specific, objective, and articulable facts which would reasonably suggest to an experienced officer that assistance *was needed*," *id.* at 637 (emphasis added), is inconsistent with the more flexible standard in our caselaw—i.e., "whether the facts available to the officer at the time of the stop would lead a reasonable person to believe that the action taken by the officer was appropriate," *Tague*, 676 N.W.2d at 204; *see Kurth*, 813 N.W.2d at 277 (requiring the state to show "specific and articulable facts that indicate [the officer's] actions were proper" (quoting *Crawford*, 659 N.W.2d at 542)). Under our precedent, the officer does not need specific facts indicating that assistance is needed, only that it may be needed. *See Kern*, 831 N.W.2d at 172; *see also Tyler*, 867 N.W.2d at 170; *cf. Livingstone*, 174 A.3d at 617 (noting the Pennsylvania Superior Court, which was reversed in the opinion, upheld the trooper's actions because

"the circumstances were sufficient to suggest . . . that assistance might be needed").

When we apply our three-part inquiry as set forth above, we believe the stop in this case complied with the Fourth Amendment. Under the first part of the test, the State concedes there was a seizure. Next, we consider whether Deputy Hochberger's conduct amounted to bona fide community caretaking activity.

At the suppression hearing, Deputy Hochberger testified that he regularly stops behind vehicles stopped alongside the roadway in order to "check on the welfare of the occupants or see if they need any assistance." In this case, it was the middle of the night, Deputy Hochberger was traveling along a highway slightly outside of town, the vehicle was pulled over just two feet off from the roadway itself, and the vehicle's brake lights were activated. We conclude this was bona fide community caretaking activity.

Lastly, we balance the public need and interest against the intrusion on privacy. We believe the public interest in having officers check on the welfare of a motorist pulled over at the side of a highway in the middle of the night is significant. There could be many reasons why the motorist needs help. The motorist could be lost, there could be trouble with the vehicle, or the motorist could be in some kind of medical difficulty. Coffman was parked on the side of the highway at 1:00 a.m. without his hazard lights on. This created a potentially dangerous situation for himself and for other drivers who may not have seen him. The remote location and the late hour may have made it difficult for him to obtain help if he had needed it.

At the same time, the privacy intrusion was not great. A seizure occurred only because Deputy Hochberger activated his emergency

flashers. Deputy Hochberger did this for everyone's benefit, so the pulled-over vehicles would be visible and so the motorist—Coffman—would know it wasn't just a stranger approaching from behind. *Cf. Kurth*, 813 N.W.2d at 281 (noting that the officer activated his emergency flashers even though the defendant had parked in the lot of an open restaurant and the officer "could not and did not argue that he activated his emergency lights for his own protection"). The vehicle was already at rest when Deputy Hochberger activated the flashers, and the setting was by the side of a highway. *See id.* at 280–81. After performing this balancing, we conclude the public interest here outweighed the intrusion on privacy. We find the decisions discussed above from appellate courts in Utah, West Virginia, Wisconsin, Montana, Illinois, Tennessee, South Dakota, North Dakota, Alaska, and Minnesota to be persuasive.

Furthermore, the deputy's actions here were tailored to providing assistance only to the extent it may have been needed. *See id.* at 278 ("[T]he officer may not do more than is reasonably necessary to determine whether a person is in need of assistance, and to provide that assistance." (quoting *Crawford*, 659 N.W.2d at 542–43)). Deputy Hochberger's conduct, which included activating his emergency lights, parking behind the parked car, and approaching the vehicle on foot to check on its occupants, was reasonable given the objective of safely determining whether the motorist needed help. *See, e.g.*, *Anderson*, 362 P.3d at 1240. The deputy's decision to address this roadside situation was not unreasonable, and arguably it would have been "a dereliction of duty" to ignore it. *See Lovegren*, 51 P.3d at 476. Many motorists would appreciate and expect officers to engage in this kind of community caretaking activity.

Coffman suggests the deputy should not have stopped behind his vehicle and could have accomplished his community caretaking purpose

by pulling alongside it instead.  This would have been impractical.  *See Kramer*, 759 N.W.2d at 611 ("Kramer suggests that Wagner could simply have pulled up along side of his vehicle, rolled down the window and asked if Kramer needed assistance.  We conclude that doing so would have required Wagner to stop in the middle of one lane of a two-lane highway.  Doing so would have added to the dangerousness of the stop for both Wagner and Kramer, if an inattentive motorist had come to the crest of the hill without appreciating that the officer's vehicle was blocking one lane of traffic.").  The best way for Deputy Hochberger to determine whether the Coffmans needed help was to talk to them.

Providing help to motorists is an important function performed by law enforcement officers.  In 2016 alone, Iowa state troopers assisted more than 11,462 motorists in need.  Iowa Dep't Pub. Safety, *FY2016 Annual Report* 22 (2016), www.dps.state.ia.us/commis/pib/Annual_Report/2016/FY2016AnnualReport.pdf [https://perma.cc/J7E4-BRMT].  The year before, the Story County Sheriff's Office reported assisting 957 motorists.  Story Cty. Sheriff's Office, *2015 Annual Report*, Story County, Iowa 11 (2015), http://www.storycountyiowa.gov/index.aspx?NID=963 [https://perma.cc/H6QW-XZ3U].  By way of comparison, this is only slightly less than the number of speeding tickets the office issued.  *Id.*

We hold that this particular encounter fell within the community caretaking exception to the Fourth Amendment's warrant requirement, as we have interpreted that exception in prior cases and as most other jurisdictions have interpreted it.

**C.  Community Caretaking Exception Under Article I, Section 8.**
Coffman also argues that even if the stop complied with the Fourth Amendment, we should interpret the community caretaking doctrine

differently under the Iowa Constitution. The State counters that error has not been preserved on this point because the defendant did not assert this position until he filed a motion for reconsideration of the denial of his motion to suppress. The district court, however, did not indicate that it was declining to consider Coffman's arguments for reconsideration as untimely but instead reached their merits. Accordingly, we conclude error was preserved. *See State v. Bowers*, 661 N.W.2d 536, 540 (Iowa 2003) (electing to review an untimely motion to suppress on the merits where the district court reached the merits).

"What is required under the Iowa Constitution, in each and every case that comes before us, is . . . exercise of our best, independent judgment of the proper parameters of state constitutional commands." *State v. Short*, 851 N.W.2d 474, 490 (Iowa 2014).

In his appellate briefing, Coffman appears to merge the two distinct Iowa constitutional arguments he made below. That is, under article I, section 8, he asks us to do away with the public servant component of the community caretaking exception for evidentiary purposes only. Evidence could be used if it was obtained when an officer had "an immediate reasonable belief that a serious, dangerous event [was] occurring"—i.e., "that emergency aid is required." Meanwhile, police would still be free to respond to *other* community caretaking situations without violating the Iowa Constitution, but evidence from those situations could *not* be used.

In short, Coffman would have us establish two tiers of community caretaking interventions. Both would be lawful and constitutional, but only "emergency" interventions could provide source material for subsequent criminal prosecutions.

In support of this argument, Coffman cites *Commonwealth v. Canavan,* a decision of the Massachusetts Appeals Court. 667 N.E.2d 264

(Mass. App. Ct. 1996). *Canavan* is actually a Fourth Amendment decision, not a state constitutional case. *Id.* at 268 n.8. There, the appellate court found an officer was not justified in pulling over a moving vehicle that he suspected to be lost. *Id.* at 265, 268. The officer had no other basis for believing the driver needed assistance. *Id.* at 265. The court noted that the interest in aiding the motorist "may 'be as well served by having the police officer make his presence known and leaving to the motorist the decision as to whether to stop and seek directions.' " *Id.* at 266 (quoting *United States v. Dunbar*, 470 F. Supp. 704, 707 (D. Conn. 1979), *aff'd*, 610 F.2d 807 (2d Cir. 1979)). The decision itself, however, does not limit community caretaking to emergency situations. Instead, it draws a distinction between a lost motorist and one who may potentially be at risk to himself or others:

> *Dunbar* does not inhibit the police from making intrusions amounting to seizures when the governmental interest predominates—thus seizure even of lost motorists is justified when safety hazards are actually entailed and lights and sirens are needed to arouse the attention of the drivers and avoid mishap.

*Id.* at 267.

Furthermore, the Massachusetts court cited with approval *Commonwealth v. Leonard*, 663 N.E.2d 828 (Mass. 1996), a Massachusetts Supreme Judicial Court decision in which the court upheld a police action taken based upon the potential illness of the driver. *Canavan*, 667 N.E.2d at 268. In *Leonard*, a state trooper was determined to be justified in pulling over a driver pursuant to the community caretaking doctrine because, according to the *Canavan* court, "the police action as a whole, the opening of the door included, might be seen as part of the interaction of citizen with police for the well being of the person and so raising no constitutional issue." *Id.* (citing *Leonard*, 663 N.E.2d at 508–09). *Leonard*

is closer to the present case than *Canavan*. Neither decision supports Coffman's proposed interpretation of article I, section 8.

Notably, in another case with even more factual similarity to ours, the Massachusetts Supreme Judicial Court upheld the stop under the community caretaking exception. *See Commonwealth v. Evans*, 764 N.E.2d 841, 844 (Mass. 2002). In *Evans*, a state trooper saw a car pulled over on the side of a highway with its right blinker flashing at 11:30 p.m. *Id.* at 843. The trooper pulled behind the parked vehicle and activated his cruiser's lights, then approached the driver on foot to see if he needed assistance. *Id.* The court held this conduct "falls squarely under the trooper's community caretaking function." *Id.* at 844.

Coffman's opening brief also cited *Provo City v. Warden*, 844 P.2d 360 (Utah Ct. App. 1992). There, the Utah Court of Appeals—again applying the Fourth Amendment rather than a state constitutional provision—did "adopt . . . the imminent danger to life or limb" standard proposed by Coffman. *See id.* at 364–65. *Warden* also said that "stops which are legitimate exercises of police community caretaker responsibilities, but which are not 'reasonable' under the Fourth Amendment, may result in application of the exclusionary rule, while still achieving the objectives of community caretaking." *Id.* at 365. However, *Warden* is not good law, even in Utah. The State pointed out in its answering brief that *Warden* was expressly overruled by the Utah Supreme Court in *Anderson*, 362 P.3d at 1237, 1239. Accordingly, Coffman dropped any reference to *Warden* in his application for further review to this court.

As noted, Coffman maintains we should apply the exclusionary rule to any nonemergency acts of community caretaking, even if the acts were otherwise proper. However, the exclusionary rule exists in Iowa as a

"remedy for the constitutional violation" and to "protect[] the integrity of the courts." *State v. Cline*, 617 N.W.2d 277, 289 (Iowa 2000) (en banc), *overruled on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001). It "places the parties in the positions they would have been in had the unconstitutional search not occurred." *Id.* If law enforcement has acted in a way that is not unconstitutional or illegal but is in fact socially desirable, our article I, section 8 precedent does not provide a basis for suppressing the results of that conduct.

Law professor Michael R. Dimino Sr. elaborated on this point in the context of community caretaking searches, stating,

> Searches are either reasonable or unreasonable. Generally speaking, reasonable searches are constitutional and give rise to no issue of remedy. Unreasonable searches are unconstitutional and usually result in exclusion of evidence found during the unreasonable search. The targeted exclusionary rule, however, either requires exclusion when the police were acting reasonably in fulfilling community-caretaking function, or calls the community-caretaking search unreasonable and excludes evidence—all the while winking and nodding to police departments to encourage them to act in the very manner the court holds to be unconstitutional.

Michael R. Dimino Sr., *Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness*, 66 Wash. & Lee L. Rev. 1485, 1558 (2009) [hereafter Dimino] (footnotes omitted). We agree with Professor Dimino's basic line drawing: police conduct is either legal or illegal, and if it is legal, its fruits should not be suppressed under the Iowa Constitution.[3]

---

[3]Professor Dimino finds that a total of ten states do not recognize community caretaking *searches* as a valid warrant exception in nonemergency situations. *See* Dimino, 66 Wash. & Lee L. Rev. at 1503–04. The lead case is *People v. Mitchell*, 347 N.E.2d 607, 609 (N.Y. 1976), *abrogated by Stuart*, 547 U.S. at 404–05, 126 S. Ct. at 1948.

The present case, however, involves a vehicle seizure, not a search. *See* John W. Sturgis VII, Note, *Help! I Need Somebody (or Do I?): A Discussion of Community Caretaking and "Assistance Seizures" Under Iowa Law*, 99 Iowa L. Rev. 1841, 1863 (2014) (noting

Recently, in *State v. Ramirez,* this court confronted the question whether the results of a federal search that complied with the federal law on anticipatory warrants should be excluded from a state prosecution because Iowa law does not authorize anticipatory warrants. 895 N.W.2d 884, 886 (Iowa 2017). We concluded,

> When a bona fide federal investigation leads to a valid federal search, but the evidence is later turned over to state authorities for a state prosecution, we do not believe deterrence or judicial integrity necessarily require a reexamination of the search under standards that hypothetically would have prevailed if the search had been performed by state authorities.

*Id.* at 898. A dissent disagreed and would apply the exclusionary rule to any search within Iowa that would have violated the Iowa Constitution or Iowa statutes if conducted by Iowa officials. *See id.* at 899 (Wiggins, J., dissenting). However, Coffman wants to go a step further than the *Ramirez* dissent and suppress the results of a stop even if it violated *neither* the Iowa Constitution *nor* Iowa law. We are not persuaded this is appropriate.

During his oral argument before our court, Coffman changed course somewhat from his appellate briefing. First, Coffman posited that "the public servant doctrine should not allow officers to seize individuals." This of course would extinguish the doctrine altogether. Our discussion heretofore explains why we do not find this jurisprudential approach persuasive.

---

that all ten of these jurisdictions use the *Mitchell* test exclusively on searches). Coffman cites no case other than the overruled *Warden* decision that has limited community caretaking seizures of vehicles to emergency situations. It does appear that Nevada, a jurisdiction not included in Professor Dimino's list of ten, will uphold a community caretaking stop of a vehicle "only where there are clear indicia of an emergency." *State v. Rincon,* 147 P.3d 233, 237 (Nev. 2006).

We emphasize that today's decision applies only to vehicle seizures and should not be extended to searches.

Second, Coffman urged us to restrict the public servant doctrine to circumstances where the officer has a firm basis for concluding that the motorist *actually* needed assistance. As his counsel elaborated, he would "requir[e] the state to show specific, objective facts as to why a need existed."

Clearly, a community caretaking seizure of a motorist must be supported by objective grounds to believe the motorist or a third party affected by the motorist *may* need assistance. Still, we would not set the required threshold of proof as high as Coffman would. Coffman's threshold would deter officers from stepping into a situation, like the one in this case, where the motorist *may* need help but the officer cannot tell. Helping a citizen and investigating a citizen for commission of a crime are two different things. An officer lacking a warrant should have somewhat more latitude to do the former than to do the latter.

Thus, we believe the basic three-part test we have applied to community caretaking seizures of motorists under the Fourth Amendment also provides an appropriate standard under article I, section 8. *See Kurth*, 813 N.W.2d at 277; *Crawford*, 659 N.W.2d at 543. The requirements embedded in that test—that the community caretaking be "bona fide" and that "the public need and interest outweigh the intrusion upon the privacy of the citizen"—will protect against abuse of this warrant exception. *Crawford*, 659 N.W.2d at 543.

We do note, however, one qualification. In applying the Fourth Amendment, we have said that "the relevant test for determining whether the community caretaking exception applies is an objective one based on the information available at the time of the stop and does not depend upon the subjective motivations of the individual officers involved." *Kurth*, 813 N.W.2d at 279 n.3. Under article I, section 8, though, we believe it is

incumbent on the state to prove *both* that the objective facts satisfy the standards for community caretaking *and* that the officer subjectively intended to engage in community caretaking. As we implied in *Kurth,* the term "bona fide" generally has both an objective and a subjective component. *See id.* One law professor has advocated requiring proof of "a good-faith community-caretaking motivation" in the search context. *See* Dimino, 66 Wash. & Lee L. Rev. at 1534. Closer to home, a law student note has specifically recommended that there should be a "subjective good faith requirement" for community caretaking *seizures* under article I, section 8. *See* John W. Sturgis VII, Note, *Help! I Need Somebody (Or Do I?): A Discussion of Community Caretaking and "Assistance Seizures" Under Iowa Law,* 99 Iowa L. Rev 1841, 1873 (2014); *see also* Mary Elisabeth Naumann, *The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception,* 26 Am. J. Crim. L. 325, 359 (1999) ("The concern over the use of the doctrine as a pretext for criminal investigations tends to be the most common objection to both the use and extension of the community caretaker doctrine.").[4]

We find these authors' arguments persuasive. Investigatory seizures of motorists and community caretaking seizures of motorists should remain analytically separate. Otherwise, the latter could become simply a

---

[4]Several other state courts, applying the Fourth Amendment, have held that community caretaking stops of vehicles must be for community caretaking purposes or at least must take the officer's motive into account. *See State v. Marx,* 215 P.3d 601, 606 (Kan. 2009) ("The State failed to carry its burden of justifying the initial detention of the Marxes' motor home as a public safety stop for community caretaking purposes."); *State v. Rinehart,* 617 N.W.2d 842, 844 (S.D. 2000) (affirming denial of a motion to suppress a community caretaking traffic stop because the officer testified "his whole intention in stopping Rinehart was to see if he was all right" and "the trial court did not find fault with [the officer's] motives and was able to judge the officer's credibility as he testified"); *Kramer,* 759 N.W.2d at 607 ("[W]hen a search or seizure is not supported by probable cause or reasonable suspicion and it is contended that the reasonableness of police conduct stands on other footing, an officer's subjective motivation is a factor that may warrant consideration.").

way to perform an investigation without meeting the reasonable suspicion or probable cause standard. To insure this separation, therefore, we hold that under the Iowa Constitution, a community caretaking seizure of a vehicle must be undertaken for genuine community caretaking purposes. In a sense, this restores the community caretaking exception to its roots, where it was "totally divorced" from criminal investigation. *See Cady*, 413 U.S. at 441, 93 S. Ct. at 2528.

Here, based on our de novo review of the record while giving deference to the district court's findings, we conclude that Deputy Hochberger's motivation was to assist Coffman. Like the district court, we note that Deputy Hochberger did not run the vehicle's plates through dispatch but instead immediately went up to the driver's side of the vehicle and asked if everything was okay. Therefore, the seizure in this case met the additional requirement we have just recognized under article I, section 8.

In sum, we do not believe the conduct of the deputy in this case was unconstitutional or even deserving of criticism. Iowans expect law enforcement on patrol to offer a helping hand in situations like this where a motorist is pulled over on a public highway at night and may be in difficulty. As noted above, Iowa state troopers assisted over 10,000 motorists in need in a single year, and the sheriff's office of this county assisted nearly 1000 motorists in that time span. Applying the same three-part test we have used under the Fourth Amendment, but modifying it to impose a further requirement that the officer acted out of a genuine community caretaking motivation, we find that the stop here did not violate article I, section 8.

**IV. Conclusion.**

For the reasons stated, we affirm the judgment of the district court and the decision of the court of appeals.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Cady, C.J., and Waterman and Zager, JJ., join this opinion. Appel, J., files a dissenting opinion in which Wiggins, J., joins. Hecht, J., takes no part.

**APPEL, Justice (dissenting).**

I respectfully dissent. For the reasons expressed below, I would hold that the search and seizure was unlawful under article I, section 8 of the Iowa Constitution. In order to fully understand the context of today's decision, it is necessary to review the purposes of constitutional provisions related to search and seizure, development of the "community caretaking" exception in the United States Supreme Court, the state and federal caselaw attempting to apply it, and the implications the doctrine may have on search and seizure law generally.

**I. Purpose of Constitutional Provisions Related to Search and Seizure.**

It is important at the outset to understand the purposes of Search and Seizure Clauses in the State and Federal Constitutions. The central purpose of the Fourth Amendment and article I, section 8 of the Iowa Constitution "is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *South Dakota v. Opperman*, 428 U.S. 364, 377, 96 S. Ct. 3092, 3101 (1976) (Powell, J., concurring). The search and seizure provisions are not enabling acts designed to justify ever-expanding kinds of police intrusion but are designed to limit authorities to proper bounds. The search and seizure provisions of both the Federal and Iowa Constitutions show a distrust of police power and standardless discretion. *See* Tracey Maclin, *The Central Meaning of the Fourth Amendment*, 35 Wm. & Mary L. Rev. 197, 201 (1993).

The United States Supreme Court, of course, has recognized exceptions to the warrant requirement, and so have we. Yet, as noted in *Terry v. Ohio*, the exceptions must be "confined in scope" and "strictly circumscribed." 392 U.S. 1, 25–26, 29, 88 S. Ct. 1868, 1882, 1884 (1968).

We too have emphasized that exceptions to the warrant requirement, such as the search-incident-to-arrest doctrine, must be "narrowly construed and limited to accommodating only those interests it was created to serve." *State v. Gaskins*, 866 N.W.2d 1, 8 (Iowa 2015) (quoting *State v. McGrane*, 733 N.W.2d 671, 677 (Iowa 2007)).

Justice Jackson famously declared decades ago that the warrant requirement was imposed to ensure that a neutral and detached magistrate made the judgment calls necessary to protect privacy and liberty interests and not an officer "engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S. Ct. 367, 369 (1948). Yet, the liberty and privacy interests are not less important when the government purpose is beneficial. As noted by Justice Brandeis, "Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent." *Olmstead v. United States*, 277 U.S. 438, 479, 48 S. Ct. 564, 572 (1928) (Brandeis, J., dissenting).

Further, no encroachments on liberty are minor. As noted more than a century ago by Justice Bradley, illegitimate practices gain their footing when accepted in their "mildest and least repulsive form." *Boyd v. United States*, 116 U.S. 616, 635, 6 S. Ct. 524, 535 (1886), *overruled in part on other grounds by Warden v. Hayden*, 387 U.S. 294, 302, 306–07, 87 S. Ct. 1642, 1647–48, 1649–50 (1967). And, decisions bending search and seizure restrictions tend to creep—yesterday's close case becomes tomorrow's norm. *See State v. Pinkard*, 785 N.W.2d 592, 609 (Wis. 2010) (Bradley, J., dissenting).

**II. United States Supreme Court Cases Regarding the Community Caretaking Exception to the Warrant Requirement.**

In 1973, a divided United States Supreme Court decided *Cady v. Dombrowski*, 413 U.S. 433, 93 S. Ct. 2523 (1973), a case often identified as embracing a community caretaking exception to the warrant requirement of the Fourth Amendment. In *Cady*, a police officer, after consuming alcohol, drove his car into a guardrail and crashed into a bridge abutment. *Id.* at 435–36, 93 S. Ct. at 2525. At the scene, authorities briefly searched his vehicle for his service revolver, but the weapon was not found. *Id.* at 436, 93 S. Ct. at 2525. The officer was taken to a local police station and charged with drunken driving. *Id.* His automobile was towed to a private garage where it was left unguarded outside the premises. *Id.*

Law enforcement more thoroughly searched the police officer's seized automobile at the private garage in an effort to find the service revolver, which according to testimony at the hearing on the motion to suppress, was "standard procedure in [the police] department." *Id.* at 437, 93 S. Ct. at 2526. During the more exhaustive search, police uncovered incriminating evidence including a flashlight with spots of blood from between the two front seats of the vehicle, a bloody car mat, and bloody clothing in the trunk of the vehicle. *Id.* The question before the *Cady* Court was whether the warrantless search of the automobile passed constitutional muster under the Fourth Amendment. *Id.* at 442, 93 S. Ct. at 2528–29.

The *Cady* majority concluded that it did. *Id.* at 448, 93 S. Ct. at 2531. The majority emphasized a number of features of the case in arriving at its conclusion. First, the Court emphasized that a line of cases already established an exemption from the warrant requirement for

automobiles. *Id.* at 439–40, 93 S. Ct. at 2527. Second, the majority noted that state officials, in light of their local regulatory functions, have much more contact with vehicles than do most federal law enforcement officers. *Id.* at 441, 93 S. Ct. at 2528. Third, the Court noted that the police already had exercised a form of custody and control over the vehicle by towing it from the scene to a private garage. *Id.* at 442–43, 93 S. Ct. at 2529. Fourth, the majority noted that the search of the trunk of the vehicle was pursuant to a "standard procedure" in the local police department. *Id.* at 443, 93 S. Ct. at 2529.

> Under the circumstances, the *Cady* majority concluded that
>
> the type of caretaking "search" conducted here of a vehicle that was neither in the custody nor on the premises of its owner, and that had been placed where it was by virtue of lawful police action, was not unreasonable solely because a warrant had not been obtained.

*Id.* at 447–48, 93 S. Ct. at 2531. Further, the Court observed that the trunk of the automobile "was vulnerable to intrusion by vandals" and was "reasonably believed to contain a gun." *Id.* at 448, 93 S. Ct. at 2531.

Despite the narrow language, the Supreme Court also used the term "community caretaking," a potentially protean phrase, to describe police activities not associated with the detection and investigation of crime. *Id.* at 441, 93 S. Ct. at 2528. Specifically, the *Cady* majority observed,

> Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Id.*

The above sentence from the *Cady* majority is, of course, completely true. The interpretive question, however, as will be seen below, is whether

this language was intended to provide a springboard for a stand-alone community caretaking exception to the warrant requirement that extends far beyond the limitations expressly emphasized in the majority opinion of *Cady*.

Justice Brennan, joined by Justices Douglas, Stewart, and Marshall, dissented. *Id.* at 450, 93 S. Ct. at 2532 (Brennan, J., dissenting). Justice Brennan noted that none of the established exceptions to the warrant requirement applied under the facts of the case. *Id.* at 451–53, 93 S. Ct. at 2533–34. According to Justice Brennan, the search was not pursuant to the automobile exception because the vehicle was in the custody of the police, was not a search incident to arrest or a seizure of evidence in plain view, was not a search pursuant to a forfeiture proceeding, and did not arise from exigent circumstances. *Id.* at 451–54, 93 S. Ct. at 2533–34. Justice Brennan thus found the majority had engaged in a serious departure from established Fourth Amendment principles. *Id.* at 454, 93 S. Ct. at 2534.

The *Cady* decision itself is an inventory search case and directly led to further inventory search cases in the United States Supreme Court. *See Colorado v. Bertine*, 479 U.S. 367, 371–72, 107 S. Ct. 738, 741 (1987); *Opperman*, 428 U.S. at 374–76, 96 S. Ct. at 3099–3100 (majority opinion). These cases make no mention of a broad, stand-alone community caretaking exception to the warrant requirement. Since *Opperman* and *Bertine*, the Supreme Court has not provided further guidance on the issue of the community caretaking exception to the warrant requirement of the Fourth Amendment.

A fighting issue in the lower courts has been the extent to which the community caretaking exception in *Cady* is limited by the case's facts. Is the exception limited to searches of impounded automobiles such as those

involved in *Cady*, *Opperman*, and *Bertine*? Does it extend to other kinds of searches involving automobiles that do not involve impoundment or inventory searches? Does it extend into searches of residences?

A second fighting issue is the standard to be employed in determining whether a warrantless community caretaking search is lawful. While the *Cady* majority refers to "reasonableness" as a test of evaluating the lawfulness of law enforcement actions, what exactly does that mean? 413 U.S. at 439, 93 S. Ct. at 2527 (majority opinion). Finally, the *Cady* majority emphasizes that the search was "totally divorced" from criminal investigation or prosecution. *Id.* at 441, 93 S. Ct. at 2528. How does a court enforce the totally divorced requirement?

In the more than forty years since *Cady*, the United States Supreme Court has not addressed these issues, and as a result, the development of the community caretaking doctrine has been left to the lower courts. The only authoritative declaration from the Supreme Court has been the *Cady* decision, which permitted a warrantless search for community caretaking purposes under the limited circumstances described in that case.

In considering the scope and standards under the community caretaking exception, it is important not to conflate community caretaking with other recognized exceptions to the warrant requirement. For example, warrantless searches have been permitted when there are exigent circumstances or to render emergency aid. *See Mincey v. Arizona*, 437 U.S. 385, 392, 98 S. Ct. 2408, 2413 (1978); *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S. Ct. 1942, 1949–50 (1978). Many community caretaking searches fall within these well-established exceptions and do not require a stand-alone community caretaking doctrine. Further, many community caretaking activities of law enforcement arise from consensual encounters that do not implicate constitutional search and seizure protections. A

court's refusal to adopt an expansive, stand-alone community caretaking doctrine does not mean that police are prohibited from engaging in community caretaking, but only that if evidence is discovered without a warrant through community caretaking activities, it will be suppressed unless it is admissible under another recognized search and seizure concept.

**III. Development of Community Caretaking in Lower Federal Courts.**

In light of the limited guidance from the *Cady* majority and the vigorous nature of the dissent, it is hardly surprising that the lower federal courts have been divided with respect to the application of the community caretaking exception to the warrant requirement outside the context of a *Cady* search of an impounded automobile. For the most part, however, the federal cases do not involve searches of automobiles, which ordinarily arise in state court proceedings. Yet, the federal cases illustrate some of the fundamental issues involved in considering the scope and standards that inhere in warrantless searches pursuant to a community caretaking function.

For example, several circuits have refused to extend the community caretaking exception. These cases rely on the limiting language in *Cady* and the availability of other well-recognized exceptions to the warrant requirement. *See, e.g., United States v. Bute*, 43 F.3d 531, 535 (10th Cir. 1994) (rejecting community caretaking outside of automobile searches); *United States v. Erickson*, 991 F.2d 529, 533 (9th Cir. 1993) (holding exigent-circumstances exception adequately accommodates need for warrantless home entry); *United States v. Pichany*, 687 F.2d 204, 208–09 (7th Cir. 1982) (per curiam) ("[T]he Supreme Court did not intend to create a broad exception to the . . . warrant requirement to apply whenever the

police are acting in an 'investigative,' rather than a 'criminal' function."). On the other hand, the United States Court of Appeals for the Eighth Circuit has broken free from the limiting language and factual scenario in *Cady* and found that the community caretaking doctrine applies to searches of homes. *See United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006); *cf. Ray v. Twp. of Warren*, 626 F.3d 170, 177 (3d Cir. 2010) (holding, in the context of qualified immunity, that searching the home under community caretaking did not violate clearly established law); *Phillips v. Peddle*, 7 F. App'x 175, 179–80 (4th Cir. 2001) (same). The Sixth Circuit swings from seemingly endorsing the extension to homes to seemingly limiting the doctrine to automobiles. *Compare United States v. Williams*, 354 F.3d 497, 508 (6th Cir. 2003) ("[W]e doubt that community caretaking will generally justify warrantless entries into private homes."), *with United States v. Rohrig*, 98 F.3d 1506, 1521–22 (6th Cir. 1996) (allowing entry into a home in the middle of the night to turn down loud music disturbing neighbors).

Another question percolating through the federal courts is whether the community caretaking exception extends beyond emergency situations and inventory searches to a third amorphous category of police officers acting as public servants. Arguably, everything an officer does pursuant to his or her lawful duties is acting as a public servant. As a result, a case can be made that the public-servant exception to the warrant requirement would swallow up constitutional restrictions on warrantless searches all together. Some federal courts have seemingly limited the scope of the community caretaking doctrine by adopting the relatively stringent standards generally applicable to a warrantless search based on emergency aid. *See United States v. Stafford*, 416 F.3d 1068, 1073–75 (9th Cir. 2005); *Martin v. City of Oceanside*, 360 F.3d 1078, 1081–83 (9th Cir.

2004); *see also* Michael R. Dimino Sr., *Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness*, 66 Wash. & Lee L. Rev. 1485, 1503–04, 1504 n.90 (2009) [hereinafter Dimino].

Once the scope of permissible community caretaking has been established, the next question is what standards the court should apply in determining the validity of the warrantless search. One federal court has, like *Cady* itself, simply declared that the ultimate inquiry is whether the officer acted "within the realm of reason." *Lockhart-Bembery v. Sauro*, 498 F.3d 69, 75 (lst Cir. 2007) (quoting *United States v. Rodriguez-Morales*, 929 F.2d 780, 786 (1st Cir. 1991)); *see Cady*, 413 U.S. at 439, 935 S. Ct. at 2527. To simply declare that the search must be "reasonable" is to have no standard at all that judges can consistently and uniformly apply. *See* Dimino, 66 Wash. & Lee L. Rev. at 1499.

A more structured approach to reasonableness in the context of community caretaking is found in *United States v. Garner*, 416 F.3d 1208 (10th Cir. 2005). In *Garner*, the Tenth Circuit fashioned a three-part test for community caretaking, namely, whether "(1) there are specific and articulable facts reasonably warranting the action; (2) the government's interest outweighs the individual's interest in being free of the seizure; and (3) the scope of the detention is no more severe than necessary for its purpose." Dimino, 66 Wash. & Lee L. Rev. at 1501; *see Garner*, 416 F.3d at 1213. The second step of the *Garner* formulation is not without its problems, however, because if the government's purpose in executing the search is to assist the individual, there is no government interest to be balanced under step two: the only interest involved is, in fact, the interest of the individual being searched. *See* Dimino, 66 Wash. & Lee L. Rev. at 1502.

**IV. Development of Community Caretaking in State Courts.**

Like the federal courts, the state courts are divided on the scope and standards of the community caretaking exception. As in federal court, the struggle over the scope of the community caretaking doctrine has surfaced on the question of whether it extends to home searches.

For example, in *State v. Vargas*, the New Jersey Supreme Court considered whether evidence obtained pursuant to a warrantless welfare check was admissible. 63 A.3d 175, 177 (N.J. 2013). The *Vargas* court noted that although *Cady* was sometimes cited as a source of a stand-alone community caretaking exception to the warrant requirement, "[a] careful reading of *Cady* . . . raises the question of whether the United States Supreme Court intended to create a new stand-alone warrant exception." *Id.* at 182. In order to understand whether the development of the community caretaking doctrine "has become untethered from its initial moorings," the court examined the language in *Cady*. *Id.* at 182–83. The *Vargas* court noted that while "the Supreme Court in *Cady* recognized law enforcement's 'community caretaking functions,' it never suggested that community-caretaking responsibilities constituted a wholly new exception to the warrant requirement that would justify the warrantless search of a home." *Id.* at 183. The *Vargas* court noted that *Cady*, as well as *Opperman* and *Bertine*, never intended "community caretaking as an exception to the warrant requirement" and that "[a]ll three cases involved permissible inventory searches." *Id.* at 184.

In the end, the *Vargas* court concluded that a broad community caretaking doctrine could not support a warrantless search of a home. *Id.* at 187. The court emphasized the limited scope of *Cady* and the availability of other exceptions to the warrant requirement, including the emergency-aid and exigent-circumstances exceptions. *Id.* at 188–89; *see*

*also State v. Wilson*, 350 P.3d 800, 804–05 (Ariz. 2015) (rejecting community caretaking in homes, emphasizing *Cady* was limited to automobiles); *Vargas*, 63 A.3d at 187 (holding community caretaking doctrine does not permit warrantless entry or search of home absent exigent circumstances); *State v. Ryon*, 108 P.3d 1032, 1043 (N.M. 2005) (declining to apply community caretaking to a home search, noting that such a search must meet the requirements of the emergency-aid exception).

Other state courts, however, have expanded the scope of community caretaking beyond *Cady* to apply it to searches of homes as well, at least under some circumstances. *See People v. Ray*, 981 P.2d 928, 934 (Cal. 1999) (articulating a broad community caretaking exception); *State v. Alexander*, 721 A.2d 275, 284–85 (Md. Ct. Spec. App. 1998) (finding home search permitted under community caretaking exception); *see also Commonwealth v. Waters*, 456 S.E.2d 527, 529–30 (Va. Ct. App. 1995) (holding community caretaking could apply to seizure of individual). These cases tend to emphasize the broad nature of community caretaking responsibilities of law enforcement rather than the limiting language in *Cady*.

The Oregon Supreme Court, on the other hand, does not recognize the community caretaking exception under the Oregon Constitution. *State v. Bridewell*, 759 P.2d 1054, 1059 (Or. 1988) (en banc). Whenever a police officer is engaged in community caretaking functions, the officer must still comply with constitutional standards, including that any search and seizure must be reasonable. *Id.* The Court of Appeals of Oregon explained that while the community caretaking exception is not recognized under Oregon law, an "analogous" exception exists, namely, the emergency-aid doctrine. *State v. Christenson*, 45 P.3d 511, 514 (Or. Ct. App. 2002). Yet,

under this exception the police officer must have an objectively reasonable belief that a true emergency exists, which is a demanding standard. *Id.* Oregon courts also recognize an exigent-circumstances exception. *State v. Snow*, 94 P.3d 872, 874 (Or. 2004) (en banc). Clearly, Oregon courts feel that police officers are able to adequately assist the citizens of their state with only the emergency-aid and exigent-circumstances exceptions.

**V. Development of Community Caretaking in Iowa Supreme Court Precedents.**

We have considered community caretaking in a number of cases. Like many other courts, however, our handling of this search and seizure doctrine has not always been precise.

For example, in *State v. Kersh*, we considered the admissibility of evidence—namely a pistol—obtained pursuant to a search of an automobile and driver after police received a report that the vehicle had been driven up onto the lawn, the driver was slumped over the wheel when police arrived, and the driver did not respond to police knocks on the window. 313 N.W.2d 566, 567 (Iowa 1981), *overruled in part on other grounds by State v. Lake*, 476 N.W.2d 55, 56–57 (Iowa 1991). Police investigated but did not seize the vehicle. *Id.* at 568.

In *Kersh*, we noted that the warrantless search would be unlawful "unless it fell within one of the carefully prescribed exceptions." *Id.* We stated that the search fell within two exceptions to the warrant requirement, which we did not label. *Id.* We cited *Mincey*, however, and other cases involving the emergency-aid exception. *Id.* We also later suggested that there was reason to believe that the driver was intoxicated. *Id.* We did not, however, expressly discuss the community caretaking doctrine. Although police in *Kersh* may have been engaged in community caretaking, the case itself does not involve application of a stand-alone

community caretaking exception to the warrant requirement but instead provides a conventional application of well-established exceptions to the warrant requirement. The *Kersh* case does not expressly state whether the challenge was brought under the Fourth Amendment, article I, section 8 of the Iowa Constitution, or both.

A decade later, we decided *State v. Mitchell*, 498 N.W.2d 691 (Iowa 1993). In *Mitchell*, the defendant brought a Fourth Amendment challenge to a vehicle search. *Id.* at 693. In this case, unlike in *Kersh*, police stopped the vehicle. *Id.* at 692. The police made the stop because one of the rear taillights was out. *Id.* Although the applicable criminal statute required only that the vehicle be equipped with "a lighted rear lamp," the driver was subject to a "fix-it memorandum" under rules adopted by the Iowa Department of Public Safety. *Id.* at 693. The stop in this case was thus a result of an ongoing rule violation. *Id.* at 693–94. Generally citing *Cady*, we stated that the duties of officers extend beyond crime detection and include public-safety functions. *Id.* Yet, the fact that officers' duties are broad does not mean that a stand-alone community caretaking exception to the warrant requirement exists that provides for warrantless searches beyond situations involving exigent circumstances, emergency aid, or consensual encounters. No Iowa constitutional issue was raised in *Mitchell*.

The next case is *State v. Carlson*, 548 N.W.2d 138 (Iowa 1996). The *Carlson* case involved a warrantless, nighttime raid of a residence. *Id.* at 139. As in *Kersh*, we found in *Carlson* that police were acting lawfully under the exigent-circumstances and emergency-aid exceptions to the warrant requirement. *Id.* at 143. Blended into the discussion is dicta about the community caretaking function, but the thrust of the case is that the warrantless search was lawful under traditional exceptions to the

warrant requirement. *Id.* at 141 & n.3. *Carlson* is thus a case where the court "declare[s] that the community caretaker exception applies, but then use[s] law applicable to one of the other exceptions, such as the emergency doctrine." *See State v. Deneui*, 775 N.W.2d 221, 232 (S.D. 2009). The challenge in *Carlson* was brought under both the Fourth Amendment and article I, section 8, but no effort was made to distinguish Iowa constitutional law from prevailing federal precedent. 548 N.W.2d at 140.

After *Carlson*, we decided *State v. Moore*, 609 N.W.2d 502 (Iowa 2000) (en banc). In *Moore*, a park ranger stopped a vehicle to warn the driver that his speed posed a danger to campers parked in the area. *Id.* at 503. When the vehicle was stopped, the park ranger smelled alcohol and notified the Iowa state patrol, leading to the driver's arrest for operating a vehicle while intoxicated. *Id.* The driver sought to suppress evidence arising from the stop. *Id.* The district court denied the motion to suppress. *Id.*

On appeal, we affirmed the district court. *Id.* We noted specifically the circumstances in the park where there was a full campground with numerous families, individuals, and no sidewalks. *Id.* at 503–04. Further, the evidence showed that parked vehicles along the campsites obstructed the view of campers entering the roadway and obstructed the view that motorists would have of campers who might step out onto the road. *Id.* at 503. Under the peculiar facts and circumstances, we held that the stop was a valid public-safety function. *Id.* at 504. *Moore* solely involved a challenge under the Fourth Amendment. *See id.* Additionally, it is a third-party assistance case, where the police intervention with respect to the vehicle driver was designed to protect others and not the driver. *See id.* at 503–04.

In 2003, we decided *State v. Crawford*, a Fourth Amendment case. 659 N.W.2d 537, 539 (Iowa 2003). In *Crawford*, a call was received by a police dispatcher in the early morning hours that a person in the caller's apartment "had taken some pills" and was "physically aggressive towards [her] and was yelling and shouting." *Id.* at 539–40 (alteration in original). A second call revealed that the individual had left the apartment in a flatbed truck. *Id.* at 540. Police encountered the truck on the way to the apartment and activated their overhead lights, and the truck pulled over to the side of the road. *Id.* Crawford, the driver of the truck, disobeyed the command to remain in the vehicle and ultimately went to the patrol car. *Id.* At the patrol car, the police detected an odor of alcohol, obtained admissions from Crawford, and administered a preliminary breath test, the results of which showed intoxication above the legal limit. *Id.*

For the first time, we canvassed the community caretaking doctrine in some detail. *Id.* at 541–43. We noted that warrantless searches are per se unreasonable, "[s]ubject to a few carefully drawn exceptions." *Id.* at 541. In discussing community caretaking, we cited a commentary that noted "the community caretaking exception encompasses three separate doctrines: (1) the emergency aid doctrine, (2) the automobile impoundment/inventory doctrine, and (3) the 'public servant' exception noted in *Cady*." *Id.*; *see* Mary Elisabeth Naumann, Note, *The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception*, 26 Am. J. Crim. L. 325, 330–41 (1999). Aside from the commentary, we cited no caselaw for the proposition that community caretaking involves an amorphous public-servant prong. *See Crawford*, 659 N.W.2d at 541. We then broadly stated, somewhat inaccurately, that we had applied the community caretaking doctrine in *Moore*, *Carlson*, *Mitchell*, and *Kersh*. *Id.*

at 542. *Moore, Carlson,* and *Kersh* involved emergency or exigent circumstances, while *Mitchell* involved an ongoing infraction of the law.

In *Crawford,* we stated that in community caretaking cases, the reasonableness of the warrantless search is based on the facts and circumstances of the case, that reasonableness is determined by balancing the public need against the nature of the intrusion on the privacy of the individual, and that pursuant to the balancing requirement, "the state has the burden of 'showing specific and articulable facts that indicate their actions were proper.'" *Id.* at 542 (quoting *Carlson,* 548 N.W.2d at 142). We then proceeded to embrace a three-pronged test for community caretaking as articulated by a Wisconsin appellate court in *State v. Anderson.* *Id.* at 543 (citing *State v. Anderson,* 417 N.W.2d 411, 414 (Wis. Ct. App. 1987)). Under the three-pronged *Anderson* test, a court considering the validity of a warrantless search under the community caretaking exception asks

> (1) was there a seizure within the meaning of the Fourth Amendment?; (2) if so, was the police conduct bona fide community caretaker activity?; and (3) if so, did the public need and interest outweigh the intrusion upon the privacy of the citizen?

*Id.*

In applying the *Anderson* test, the *Crawford* court found that there was a seizure. *Id.* The *Crawford* court then stated that the second step of the analysis rested on "whether the facts available to the officer at the moment of the seizure would have warranted a reasonable person to believe an *emergency* existed." *Id.* (emphasis added). As to this step, we noted that police had received a report of a male subject taking some pills, being physically aggressive, being confused and not knowing where he was, and leaving in a flatbed truck. *Id.* We concluded that this was

sufficient for the officer to take the action he did "in the interest of public safety and *emergency aid.*" *Id.* (emphasis added). We then briefly turned to the balancing test and stated that the need and interest in determining the condition of a person taking pills and acting oddly was sufficient to outweigh the minimal intrusion of the defendant driver's rights. *Id.* Although the case nominally involved community caretaking, the language of *Crawford* emphasizes the emergency-aid doctrine as providing the exception to the warrant requirement.

We came to a different conclusion in a challenge to a warrantless search under article I, section 8 of the Iowa Constitution in *State v. Tague*, 676 N.W.2d 197, 206 (Iowa 2004). In *Tague*, an officer followed a vehicle for about a mile at about 2:00 a.m. and observed the vehicle cross over the left edge of the roadway. *Id.* at 200. At this point, the officer activated his emergency lights and pulled the vehicle over. *Id.* Once pulled over, the officer approached the vehicle, detected the odor of alcohol, and observed the driver's bloodshot eyes and a slight slur to his speech. *Id.* After conducting a field sobriety test, the driver was arrested for operating under the influence. *Id.*

In *Tague*, the state defended the stop on the ground there was reason to believe that the driver was either intoxicated or fatigued. *Id.* at 204. After canvassing the record for particular and articulable facts to support the stop, we concluded that an isolated incident of briefly crossing the edge line does not give rise to suspicion of either intoxication or fatigue. *Id.* at 205–06. We noted,

> Drivers talking on their cell phone, looking at a map, adjusting the radio, adjusting the heater, defroster or air conditioner, or checking on a child restrained in the back seat can lead a driver to momentarily cross an edge line, without giving rise to a reasonable suspicion of intoxication or fatigue.

*Id.* at 205.

Our most recent community caretaking case is *State v. Kurth,* where the defendant challenged a warrantless search of his automobile under the Fourth Amendment. 813 N.W.2d 270, 271 (Iowa 2012). In *Kurth,* an officer activated his emergency lights and blocked in a driver in a parking lot based on the officer's belief that the vehicle had struck an object in the roadway and suffered minor damage not affecting the drivability of the car. *Id.* at 271–72. We outlined the *Cady* opinion, citing a commentator who noted that the case provided "little doctrinal guidance from the Supreme Court other than the vague command of reasonableness." *Id.* at 273 (quoting Dimino, 66 Wash. & Lee L. Rev. at 1490).

In sum, our cases have been inconsistent. In *Kurth, Carlson,* and *Crawford,* the searches involved community caretaking but were analyzed under the emergency-aid or exigent-circumstance exceptions to the warrant requirement. In *Moore,* although the officer was engaged in community caretaking, traditional emergency-aid or exigent-circumstances doctrines could have supported the officer's actions. Finally, in *Tague* and *Kurth,* we refused to apply a broad, stand-alone community caretaking doctrine under the facts and circumstances of the case. In no case have we affirmatively stated that the community-caretaking doctrine, whatever it includes, is broad enough to cover situations where law enforcement is providing assistance to the driver of a vehicle—first-party assistance—nor have we considered the requirements that the state must show for a warrantless first-party assistance search to meet constitutional standards.

**VI. Survey of State and Federal Cases Involving First-Party Assistance Searches and Seizures of Stopped Vehicles and Motorists Under the Community Caretaking Exception.**

We now turn to cases involving warrantless first-party assistance searches and seizures of vehicles on the side of the road. Given the doctrinal uncertainty surrounding community caretaking, it comes as no surprise that the caselaw related to warrantless searches and seizures of such vehicles is scattered. It is no doubt true that the results in the cases turn on the totality of the facts and circumstances, and as a result, the precedents may not provide a basis for rigid reliance. Yet, a survey of the cases can help inform our analysis of the present controversy.

A substantial number of cases involving first-party assistance seizures of stopped vehicles have required specific, articulable facts demonstrating a reasonable belief that the driver or passengers were in need of assistance. These cases often emphasize that when there are only generalized concerns, law enforcement may utilize less intrusive means to determine whether there is a need of assistance but may not engage in warrantless seizures.

An illustrative case is *Commonwealth v. Livingstone*, 174 A.3d 609 (Pa. 2017). In *Livingstone*, police encountered a vehicle parked on the side of the road at 9:30 p.m. *Id.* at 614. The hazard lights of the vehicle, however, were not activated. *Id.* The *Livingstone* court determined that if there was a public-servant prong to community caretaking, there must be a means that "will cabin reliance on the exception and enable courts to properly assess its employment." *Id.* at 635. The court determined that in order to apply the public-servant prong of community caretaking to a parked vehicle, the officer "must be able to point to specific, objective, and articulable facts that would reasonably suggest to an experienced officer that a citizen is in need of assistance." *Id.* at 634. As in *Tague*, the

*Livingstone* court noted that there are many possibilities that could cause a vehicle to be on the side of the road, namely, to look at a map, make telephone calls, send text messages, or pick something up off the floor. *Id.* at 634–35. The court held the seizure invalid and suppressed resulting evidence obtained from it. *Id.* at 638.

*State v. Boutin* is a similar case. 13 A.3d 334 (N.H. 2010). Here, a vehicle was on the "pull off" of a road at 8:35 p.m. on a dark, cold night with snow on the ground. *Id.* at 335. A police officer seized the vehicle in order to make sure everyone was "okay." *Id.* at 337. According to the *Boutin* court, however, there were no specific and articulable facts to justify the intrusion. *Id.* The court observed that the vehicle was parked legally and there were no "signs of an accident, that the car was disabled, or that the passengers were in any type of distress." *Id.* The court stated that the officer had "generalized concerns" but the officer "did not describe any specific and articulable facts that justified the intrusion." *Id.* The officer's actions, according to the court, amounted to nothing more than a hunch. *Id.* The court further noted that a seizure of the vehicle and its occupants was not necessary as the officer could have activated his rear-facing lights and could have used a spotlight to illuminate the parked vehicle if necessary. *Id.* at 338; *see also State v. Schmidt,* 47 P.3d 1271, 1274 (Idaho Ct. App. 2002) (holding detention of vehicle pulled off the road not reasonable under community caretaking).

A third case of interest is *Ozhuwan v. State,* 786 P.2d 918 (Alaska Ct. App. 1990). Here, an officer encountered two cars parked at night in an area near a boat launch in a campground, a place where teenagers were known to congregate to drink. *Id.* at 920. The officer activated his emergency lights, thereby seizing the vehicles and their occupants. *Id.* at 921. The *Ozhuwan* court concluded that a general awareness that the

campground was used at night as a place for minors to drink was insufficient to support the search and seizure. *Id.* at 921–22. The court emphasized that there was no actual indication of any problem and that no request for assistance had been received. *Id.* at 922. While the court noted that generalized concerns for safety could certainly have justified a contact in a nonintrusive manner, the generalized concerns did not support a seizure. *Id.*

A fourth case illustrating the limits of community caretaking in a first-party assistance case is *State v. Button*, 86 A.3d 1001 (Vt. 2013). Here, shortly before midnight, the defendant pulled to the side of the road and stopped with his engine running and lights on. *Id.* at 1002. According to the *Button* court, the vehicle did not pose a traffic hazard. *Id.* at 1005. The court held the seizure unlawful. *Id.* at 1006. The court noted that had the "defendant indicated that he needed help, or parked in a precarious location," the result might be different. *Id.* Yet, under the circumstances, the court reasoned that the officer could have slowly driven by the defendant's car while looking through the window to determine whether the driver needed help. *Id.*

Two cases out of Montana show the privacy interests that people have in their automobiles when parked at night. In *State v. Hoover* and *State v. Graham*, adults engaging in consensual intimacy in their parked cars were seized by law enforcement officers. *Hoover*, 402 P.3d 1224, 1227–28 (Mont. 2017); *Graham*, 175 P.3d 885, 887 (Mont. 2007). In both cases, the locations of the parked vehicles were somewhat unusual. *Hoover*, 402 P.3d at 1227 (involving a vehicle parked in between two storage units at automobile dealership lot); *Graham*, 175 P.3d at 887 (stating police officer observed vehicle "parked on a dirt pullout within plain sight of the road"). There were no specific and articulable facts,

however, that suggested the persons in the vehicles were in need of assistance. *Hoover*, 402 P.3d at 1235; *Graham*, 175 P.3d at 891. Any undeveloped, generalized suspicions were insufficient to support the seizures and subsequent searches. *Hoover*, 402 P.3d at 1235; *Graham*, 175 P.3d at 891.

There is one federal case dealing with the seizure of a parked vehicle. In *United States v. Gross*, a police officer noticed a person slumped down in the front passenger seat of a lawfully parked vehicle. 662 F.3d 393, 396 (6th Cir. 2011). The officer parked his car directly behind the vehicle, blocking it in, and turned on his vehicle spotlight. *Id.* at 396. The officer then approached the passenger side door and asked the passenger for identification. *Id.* at 397. The officer ran a warrant check, discovered an outstanding warrant, and arrested the passenger. *Id.*

The Sixth Circuit rejected the claim that the seizure was permissible under the community caretaking doctrine. *Id.* at 400. The *Gross* court emphasized that there was no indication that community caretaking was needed. *Id.* at 400–01. Further, the *Gross* court emphasized any legitimate caretaking "could have been accomplished through a consensual encounter rather than" by blocking in the vehicle and investigating the occupant. *Id.* at 401.

There are, however, first-party assistance cases involving parked vehicles where seizures under the public-servant prong of community caretaking have been upheld. These cases, however, often emphasize specific and particular facts *related to the need for first-party assistance* to support the seizure.

For example, there are a number of first-party assistance cases involving parked vehicles sustaining community caretaking seizures in what might be called slumped-driver cases. *See, e.g., In re Suspension of*

*Driver's License of Clayton*, 748 P.2d 401, 402–03 (Idaho 1998); *Kozak v. Comm'r of Pub. Safety*, 359 N.W.2d 625, 627, 628 (Minn. Ct. App. 1984); *State v. Lovegren*, 51 P.3d 471, 472, 474, 476 (Mont. 2002). In these cases, an officer observes a driver slumped over the wheel of a parked car before a seizure is made. Knowledge of the presence of a slumped driver provides sufficient particularized concern to justify a seizure of the vehicle and subsequent search.

A second category of first-party assistance cases involving parked vehicles are cases where assistance is impliedly invited. *See, e.g., People v. McDonough*, 940 N.E.2d 1100, 1103, 1110 (Ill. 2010); *State v. Anderson*, 362 P.3d 1232, 1234, 1240 (Utah 2015); *State v. Kramer*, 759 N.W.2d 598, 601, 610 (Wis. 2009). For instance, in cases where the parked vehicle has flashing emergency or hazard lights, seizures have been found lawful and the evidence arising from them has not been suppressed.

A third category of first-party assistance cases involving parked vehicles arises where odd circumstances surround the parked vehicle. For instance, in *State v. McCormick*, the defendant's vehicle was parked kittywampus across the entryway of a closed grocery store, with seventy-five percent of the entryway blocked, and a left wheel protruding onto the public roadway at around 2:45 a.m. 494 S.W.3d 673, 676 (Tenn. 2016). The officer activated his rear lights and found the driver slumped over the wheel. *Id.* The *McCormick* court found sufficient particularized facts to support the actions of law enforcement. *Id.* at 688–89.

In general, though the results in the first-party assistance cases involving stopped vehicles are somewhat mixed, the caselaw embraces a concern that the public-servant prong of community caretaking must be carefully cabined through a particularized showing that the driver or occupants are likely to desire or consent to assistance by law enforcement.

*See, e.g., Boutin*, 13 A.3d at 336 (stressing warrantless seizures must fall "within the narrow confines of a judicially crafted exception"); *State v. Diloreto*, 850 A.2d 1226, 1237 (N.J. 2004) ("The community caretaker doctrine remains a narrow exception to the warrant requirement."); *Livingstone*, 174 A.3d at 635 (requiring officer to articulate specific and objective facts to "cabin reliance on the exception and enable courts to properly asses its employment"); *McCormick*, 494 S.W.2d at 688 ("[C]ourts must meticulously consider the facts and carefully apply the exception in a manner that mitigates the risk of abuse.").

### VII. Analysis.

I begin by considering the lesser claim advanced by Coffman, namely, that even assuming the validity of a public-servant prong of community caretaking, the seizure in this case was unlawful. In considering the validity of a warrantless search and seizure, the burden of rebutting a presumption of unlawfulness rests with the government. *State v. Horton*, 625 N.W.2d 362, 368 (Iowa 2001) (en banc) (Snell, J., dissenting); *State v. Moriarty*, 566 N.W.2d 866, 868 (Iowa 1997).

The first question under *Crawford* is whether there was a seizure. 659 N.W.2d at 543. The State does not contest that a seizure occurred when the officer in this case activated his overhead emergency lights. There is ample authority for the proposition that a seizure occurs when a police officer activates emergency lights and pulls behind a parked vehicle. *See, e.g., Livingstone*, 174 A.3d at 621–25; *Anderson*, 362 P.3d at 1237. *But see Kramer*, 759 N.W.2d at 606 (assuming without deciding that driver was seized).

The second question is whether the police officer was engaging in a bona fide community caretaking activity. *Crawford*, 659 N.W.2d at 543. In order to support the seizure in this case as a bona fide community

caretaking activity, under the better-reasoned cases, there must be specific, peculiar, and articulable facts to support the notion that the occupants of the vehicle consented to receiving assistance. *See Schmidt*, 47 P.3d at 1274; *McDonough*, 940 N.E.2d at 1109. We said as much in *Crawford*, where we stated that "specific and articulable facts" were required to support the warrantless seizure. 659 N.W.2d at 542–43.

The requirement of specific, peculiar, and articulable facts is critical to any community caretaking analysis. Even the cases that embrace the public-servant prong of community caretaking emphasize the need for providing effective limits to prevent abuse. *See Livingstone*, 174 A.2d at 637; *McCormick*, 494 S.W.2d at 688. Without clear controls, the public-servant prong could swallow search and seizure protections. *Ray*, 981 P.2d at 941 (Mosk, J., dissenting). If there is to be a public-servant aspect of the community caretaking exception, it must be carefully controlled.

Here, the State did not meet its burden of showing specific, particularized reasons for the seizure. At best, the police officer may have had a generalized concern about the situation of the occupants in the vehicle. In *Tague*, we emphasized that there are many reasons why a person might swerve once over the line on the left side of the road. 676 N.W.2d at 205. Similarly, the caselaw demonstrates that there are all kinds of reasons why a person might pull off the road. *See Livingstone*, 174 A.3d at 634–35 (listing reasons).

It is also important to note what was absent here. There was no slumped driver, no activation of hazard lights, no objective indices of a request for help, no oddball parking, and no safety hazard. As the above discussion indicates, many of the cases supporting seizures of parked vehicles rely upon these types of particularized facts. *See, e.g., Clayton*, 748 P.2d at 402 (involving a slumped driver); *McCormick*, 494 S.W.3d at

688 (involving vehicle parked kittywampus blocking entrance to grocery store late at night and driver slumped over); *Kramer,* 759 N.W.2d at 610 (holding search constitutional when driver's hazard lights were activated).

And, there was no reason why a consensual encounter, rather than a seizure, would not have been sufficient to satisfy any community caretaking interest. "[T]he multitudinous everyday contacts between police officers and individuals do not approach any need for forcible intrusions on privacy." *Commonwealth v. Canavan,* 667 N.E.2d 264, 267 (Mass. App. Ct. 1996). A number of parked-vehicle cases persuasively stand for the proposition that interventions less than seizures are adequate to vindicate any community caretaking function. *Gross,* 662 F.3d at 401; *Ozhuwan,* 786 P.2d at 922; *Boutin,* 13 A.3d at 337–38; *Button,* 86 A.2d at 1002.

It is true, of course, that the incident occurred at night. This is, at best, a double-edged sword. As police found in *Hoover,* 402 P.3d at 1227, and *Graham,* 175 P.3d at 887, night time parked vehicles may be used for consensual intimate encounters. To paraphrase the New Hampshire Supreme Court, if we were to accept this argument, we would be rendering the constitutional protection dependent on the time of day. *Cf. Boutin,* 13 A.3d at 337 (rejecting role of seasons in validating search).

Further, this case involves a seizure designed to benefit the party seized, or a first-party assistance seizure. When a first-party assistance seizure is involved, there is no government interest beyond that of assisting the individual. *See State v. Kinzy,* 5 P.3d 668, 681 (Wash. 2000) (en banc) ("Rendering aid or assistance through a health or safety check is a hallmark community caretaking of the function exception."); *cf. Kramer,* 759 N.W.2d at 611 (stressing the public interest involved is assisting motorists). Such seizures can be justified, not by balancing the interests

of the government against the individual, but only on a theory of implied consent that focuses solely on the individual. When the government acts to protect a person, "the only relevant perspective is that of the individual citizen." Ronald J. Bacigal, *Choosing Perspectives in Criminal Procedure*, 6 Wm. & Mary Bill Rts. J. 677, 728–29 (1998). In this case, there was no reason based on the facts known to the police officer to believe that the occupants of the vehicle desired police assistance.

And, under Iowa law the privacy interest of a party in an automobile is substantial. In *State v. Vance*, we cited a body of academic writing that seeks to increase privacy protections with respect to automobiles compared to recent United States Supreme Court precedent. 790 N.W.2d 775, 787 (Iowa 2010); *see* Carol A. Chase, *Cars, Cops, and Crooks: A Reexamination of* Belton *and* Carroll *with an Eye Toward Restoring Fourth Amendment Privacy Protection to Automobiles*, 85 Or. L. Rev. 913, 940–41 (2006). In his concurring opinion in *State v. Storm*, Chief Justice Cady concluded that under the facts presented, a warrantless search of an automobile could be sustained on an exigent-circumstances theory but only because the defendant failed to show that technology made the acquisition of a warrant practical under the circumstances of the case. 898 N.W.2d 140, 157 (Iowa 2017) (Cady, C.J., concurring specially). Notably, the concurring opinion did not emphasize the lessened expectation of privacy in an automobile but only its mobility. *See id.* Automobiles are used by Iowans for many purposes, which may include taking a snooze, rubbing the neck of a spouse, as here, or other intimate acts.

In light of the above discussion, it is not necessary to address the larger argument that we should decline to adopt a community caretaking exception that includes the public-servant prong. There are, of course,

some important reasons supporting such a view. As has been pointed out above, nothing in *Cady* itself specifically embraces a broadly framed, stand-alone community caretaking exception. Further, rejection of a broadly framed community caretaking exception would have limited impact on law enforcement as many community caretaking encounters are either consensual or supported by the emergency-aid or exigent-circumstances exceptions. In addition, as demonstrated by the review of caselaw, the public-servant prong tends to be highly fact specific, which could lead to lack of clarity in the law and the slicing and dicing of fact patterns with no principled rule of decision. *See, e.g.*, *Graham*, 175 P.3d at 891 (characterizing case as a close call); *State v. Cryan*, 727 A.2d 93, 95 (N.J. Super. Ct. App. Div. 1999) (same); *Pinkard*, 785 N.W.2d at 603 (majority opinion) (same). For those who favor bright-line rules for adjudication and who advocate certainty and predictability in the law, the elimination of the potentially sprawling public-servant prong might be in order. Yet, by tightly cabining the public-servant prong in first-party assistance cases with a requirement of specific and particularized facts related to the question of whether the occupants of the parked vehicle are manifesting any desire for assistance, the potential abuse is at least limited if not eliminated. In any case, it is not necessary for us to address the larger question today.

**VIII. Conclusion.**

In my view, for the above reasons, the seizure here was invalid under article I, section 8 of the Iowa Constitution. As a result, I respectfully dissent.

Wiggins, J., joins this dissent.